IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JESSE ANAYA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 21-cv-02624 |
| v. ) | |
| ) | District Judge Mary M. Rowland |
| WILLIAM T. BIRCK, ) | |
| BRYAN KREUGER, & ) | Magistrate Judge Jeffrey I. Cummings |
| REED ILLINOIS CORPORATION, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jesse Anaya has filed motions to compel the production of an email sent from Sheryl Jaffee Halpern, outside corporate counsel to defendant Reed Illinois Corporation, (Dckt. #55), and certain communications sent to and from defendants William Birck and Bryan Kreuger, (Dckt. #63), and defendants have responded to both motions, (Dckt. ##64, 67). Separately, Reed has filed a motion pursuant to Federal Rule of Civil Procedure 45(3)(a) to quash Anaya's subpoena for the deposition of Halpern, (Dckt. #71), to which Anaya responded, (Dckt. #72). For the reasons set forth below, Anaya's motion to compel related to the Halpern email is denied, his motion to compel related to communications sent to and from Birck and Kreuger is granted under the terms specified below, and Reed's motion to quash the subpoena of Halpern is granted.

**I.     BACKGROUND**

Plaintiff Jesse Anaya, a Hispanic man, began working as Reed's Information Technology Manager in August 2014. Emma Fairweather, an African American woman, was Reed's Human Resources Manager and had the responsibility of supervising Anaya. (*Id.* at 3). At all relevant

1

times, defendant William Birck was Reed's Chief Executive Officer and defendant Bryan Kreuger was Reed's President and Chief Operating Officer.

On April 13, 2021, Fairweather sent a twelve-page letter to Kreuger outlining several allegations of racism at Reed. One example of perceived discrimination cited by Fairweather was the fact that she had recommended to Kreuger on March 17, 2021, that Anaya be promoted and receive a raise because he was an "underpaid . . . key employee to [Reed's] operations and has well-earned this title and salary change," (Dckt. #67-1 at 2), but Kreuger had not acted on her recommendation. Fairweather ended her letter by tendering her resignation. The following day, Kreuger asked Anaya about the allegations in Fairweather's letter. Anaya informed Kreuger that he too believed that Reed had a problem with racism and felt that he had been denied a promotion due to his race. Shortly following this conversation, Kreuger sent an email to another Reed executive in which he stated that he did not "necessarily agree" with Fairweather's recommendation. (Dckt. #67-1 at 2). The parties agree that Reed never granted Anaya the promotion and raise that Fairweather had recommended he receive.

After Fairweather resigned, Reed's outside counsel, Much Shelist, P.C., hired attorney Rachel Ablin to conduct an investigation into allegations of discrimination at Reed. (Dckt. #55 at 10). On April 20, 2021, Birck informed Anaya that the investigation would be taking place and Anaya would be expected to participate. Anaya stated that he would not participate in Ablin's investigation and that he was considering filing his own charge of discrimination. The following day, Anaya's supervisor, Ashley Polino, allegedly told Anaya that "he had to speak to the company's investigators." (Dckt. #21 at ¶19). Anaya again refused.

Anaya was terminated two days later on April 23, 2021. While Anaya alleges that he was terminated because he failed to take Reed's side in the disagreement between Reed and

2

Fairweather, Reed claims that Anaya was terminated because he "had been surreptitiously reading and forwarding to his own personal email address various emails that Reed's senior executives had been sending to each other and to their outside legal counsel about Anaya and Fairweather." (Dckt. #64 at 2).

Anaya alleges that following his termination, Reed threatened to sue him for violations of the Computer Fraud and Abuse Act and breach of contract unless he agreed to forego his civil rights claims, apologize, and support Reed against Fairweather's discrimination claims. To support his assertion that Reed engaged in a "campaign of intimidation," Anaya cites the letter terminating his employment, in which Birck (Reed's CEO) wrote that it would "behoove" Anaya to "cooperate," because his "choices going forward may make a difference with respect to how Reed chooses to address [his] previous infractions." (Dckt. #72 at 13). Anaya also references an email that Halpern – who serves as outside corporate counsel for Reed – sent to the attorney representing Anaya in settlement negotiations with Reed, which stated that:

> [I]t's time for [Anaya] to make a decision regarding the path he wants to take. My client has directed me to have my litigation team file an action against [Anaya] if this matter is not resolved to Reed's satisfaction by the end of this week. He should keep in mind that if such action is necessary, Reed will be entitled to recover not only its actual damages, but also attorneys' fees and costs incurred as a result of [Anaya]'s illegal conduct. Neda, I do hope to hear from you soon with a favorable response so that litigation is not necessary.

(Dckt. #72 at 3).

Undeterred, Anaya filed this lawsuit against Birck, Kreuger, and Reed on May 14, 2021. Anaya alleges that defendants violated 42 U.S.C. §1981 by retaliating against him when they failed to promote him or give him a raise, and, ultimately, fired him and threatened to sue him if he engaged in legal action to challenge their conduct. Anaya further alleges that Reed unfairly compensated him based on his race and failed to notify him of his right to continued health

3

insurance coverage under COBRA.  Reed generally denied Anaya's allegations and asserted counterclaims alleging that Anaya violated the Computer Fraud and Abuse Act, 18 U.S.C. §230, and breached his fiduciary duty and his confidentiality agreement with Reed.

## II. LEGAL STANDARD

Courts have broad discretion in resolving discovery disputes and do so by adopting a liberal interpretation of the discovery rules.  *Chicago Reg. Council of Carpenters Pension Fund v. Celtic Floor Covering, Inc.*, 316 F.Supp.3d 1044, 1046 (N.D.Ill. 2018).  Rule 26 provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."  Fed.R.Civ.P. 26(b)(1); *see Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 365 F.Supp.3d 916, 924 (N.D.Ill. 2019) ("Relevance focuses on the claims and defenses in the case, not its general subject matter.").  Discoverable information is not limited to evidence admissible at trial.  Fed.R.Civ.P. 26(b)(1).

A party may file a motion to compel under Federal Rule of Civil Procedure 37 whenever another party fails to respond to a discovery request or when its response is insufficient.  Fed.R.Civ.P. 37(a).  A party may file a motion to quash or modify a subpoena that requires the disclosure of privileged or other protected matter (if no exception or waiver applies) or subjects a person to undue burden.  Fed.R.Civ.P. 45(c)(3).  Deciding whether to grant either motion lies within the sound discretion of the Court.  *See Griffin v. Foley*, 542 F.3d 209, 223 (7th Cir. 2008).

## III. ANALYSIS

### A. Reed need not produce the April 21, 2021 email sent from its outside general counsel to its consulting counsel.

On April 21, 2021, Halpern (Reed's outside corporate counsel) emailed Ablin (the attorney hired by Reed to investigate allegations of discrimination).  In the email, Halpern informed Ablin that Anaya had refused to participate in Ablin's investigation until he met with

4

his attorney. Halpern then relayed what she had instructed Anaya's supervisor to tell Anaya, however that portion of the email was redacted in discovery. (Dckt. #55 at 2) ("Jesse is refusing to meet with you until he meets with his attorney. I told his supervisor to tell him this: [redacted]."). Anaya now seeks the redacted segment of this email, which defendants argue is protected by attorney-client privilege.

The attorney-client privilege protects "confidential communications made by a client to his lawyer where legal advice of any kind is sought from a professional legal advisor in his capacity as such." *Rehling v. City of Chi.*, 207 F.3d 1009, 1019 (7th Cir.2000) (internal quotations omitted). The privilege also shields communications from attorneys to clients "if they constitute legal advice, or tend directly or indirectly to reveal the substance of a client confidence." *United States v. Defazio*, 899 F.2d 626, 635 (7th Cir. 1990). Counsel for Reed asserts that the redacted portion of the email directly quotes legal advice given by Halpern to Anaya's supervisor. (Dckt. #64 at 3). The context of the email strongly supports this assertion and Anaya does not argue otherwise. (Dckt. #55 at n.3). Instead, Anaya primarily argues that any privilege was waived when Halpern repeated the advice to Ablin.

While it is true as a general matter that a party waives the attorney-client privilege when the otherwise privileged documents are disclosed to a third party, there is a well-recognized exception to this general rule "when that third party is present to assist the attorney in rendering legal services." *Jenkins v. Barlett*, 487 F.3d 482, 491 (7th Cir. 2007); *Breuder v. Bd. of Trustees of Cmty. Coll. Dist. 502*, No. 15 CV 9323, 2021 WL 4125084, at *5 (N.D.Ill. Sept. 9, 2021), *objections overruled*, No. 15 CV 9323, 2022 WL 279277 (N.D.Ill. Jan. 31, 2022) (citing cases). For this exception to apply, "the third party's presence must be necessary to clarify, facilitate, or improve an attorney's comprehension of the facts on which a legal opinion will be given or a

5

client's comprehension of the attorney's opinion, so that the client could obtain informed legal advice." *Breuder*, 2021 WL 4125084, at *5 (internal quotation marks omitted). As the Seventh Circuit has recognized, this exception applies to agents of the attorney, such as paralegals, investigators, secretaries, and members of the office staff involved with client communications, as well as to outside experts engaged to assist the attorney in rendering legal services to the client. *Jenkins*, 487 F.3d at 491; *Breuder*, 2021 WL 4125084, at *6.

In this case, Ablin's engagement letter indicates that she was hired by Halpern's law firm "to conduct a neutral third-party investigation" in order to "assist [Halpern] in providing legal advice to [Reed] and/or in anticipation of potential future claims or litigation." (Dckt. #55 at 10). Thus, because Ablin was retained as an investigator to assist Halpern in providing legal advice to Reed, communications between Halpern and Ablin regarding Halpern's privileged advice to Reed fall within the exception to the third-party waiver rule. Accordingly, Reed need not produce the redacted segment of the April 21, 2021 email in question and Anaya's motion to compel regarding this email is denied.

    **B. Reed must respond to Anaya's Request for Production No. 17.**

During the course of discovery, Reed produced the following April 2021 email exchange between Birck (Reed's CEO), Michael Machat (Reed's Executive Vice President of Business Development), and David Burden (an executive at Colliers, an investment management company):

(Email from Machat to Burden and Birck at 10:30 a.m.):

> containing the subject heading "It made Fox News" with a link to https://www.foxnews.com/us/loyola-academy-civil-rights-conservative-students-veteran.[1]

---

[1] According to Reed, this link concerns a Fox news article relating to the actions of a school after it was confronted with different political viewpoints. (Dckt. #67 at 6).

(Email from Burden to Birck and Machat at 10:39 a.m.):

> Ugh. It's embarrassing and that's the fourth Fox News piece in the last 10 days. I am part of a Concerned Parents & Alumni Group trying to get the LA Administration to address this but they've gone Woke like many others in the education field. What's happening in our country is disheartening and divisive . . . BLM stuff and Woke ideology by liberals is increasing racism not helping it.

(Email from Birck to Burden and Machat on April 11, 2021):

> Agreed. That's disturbing. Until parents pull enough kids out to hurt them financially this is likely to continue.

(Dckt. #63 at 34) (collectively referenced as the "April email chain").

Anaya asserts that this email exchange demonstrates that Birck is "particularly sensitive about minorities complaining about discrimination," and he served his Request for Production No. 17 ("RFP 17," quoted below) to determine whether there are other such emails in defendants' mailboxes:

> All communications sent or received by Mr. Birck or Mr. Kreuger (including as a sender, a recipient, a carbon copy, a blind carbon copy, or on any social media account created or maintained by Mr. Birck or Mr. Kreuger) that include the following words or phrases: "woke," "BLM," "black lives matter," "Floyd," "liberal," "racism," "racist," "illegal," "illegals," "immigration," "Mexican," "Mexicans" "critical race theory," "wall," "CRT," or "Trump." For purposes of this document request, the relevant time period is January 1, 2019, to the present.

(Dckt. #63 at 2, 3, 12).

In its initial response to RFP 17, Reed stated that "[t]he Reed Parties will supplement their document production after conducting the requested ESI search" and that they "reserve[d] their right to object to the scope of this Request to the extent any identified word produces overbroad, burdensome or irrelevant results." (Dckt. #63 at 25). After Reed failed to produce any documents responsive to RFP 17, Anaya filed a motion to compel regarding this request and various other interrogatories and requests for production. (Dckt. #48). By its November 30, 2021 order, the District Court denied Anaya's motion to compel regarding RFP 17 without

7

prejudice,[2] ordered the parties to meet and confer regarding ESI protocol, and referred all discovery disputes regarding ESI discovery to this Court. (Dckt. #57).

Anaya filed his renewed motion to compel regarding RFP 17 after the parties were unable to resolve their differences and Reed refused to produce any documents responsive to the request. In its response, Reed asserts that RFP 17 seeks "completely irrelevant information" and is "nothing more than an impermissible fishing expedition" for three reasons. (Dckt. #67 at 5, 7). First, Anaya cannot rely on the April email chain to support his requests for documents responsive to RFP 17 because he first learned of the email chain through "improper means." (*Id.*, at 7-8). Second, the April email chain does not support RFP 17 because it says nothing about Anaya, Fairweather, or anyone at Reed; it does not pertain to any issues raised by Anaya's claims (i.e., promotions, salaries, or Fairweather's letter); and Birck's response in the email chain does not suggest that he is "sensitive when minorities complain about discrimination." (*Id.*, at 6). Finally, there is no allegation that any of the proposed search terms were used in Reed's workplace in a derogatory manner. (*Id.*).[3]

1. **Anaya can rely on the April email chain as a predicate for RFP 17.**

Reed claims that Anaya cannot rely on the April email chain to support his motion to compel compliance with RFP 17 because he was acting in violation of the Computer Fraud and Abuse Act when he first learned of the email chain and "where evidence was obtained in

---

[2] During the course of the November 30 hearing, Reed – which had stated its intent to conduct the ESI search requested by RFP 17 in its initial response to the request, (Dckt. #63 at 25) – objected to the inclusion of the term "wall" in RFP 17 because it would generate too much noise in the search data. Anaya has agreed to modify the request to delete this term. (Dckt. #63 at 5 n.2).

[3] Reed does not expand upon its undue burden objection in its response to the motion and the Court will consider this boilerplate objection to be abandoned. *See Fudali v. Napolitano*, 283 F.R.D. 400, 403 (N.D.Ill. 2012) (boilerplate objections are "tantamount to not making any objection at all"); *Williams v. Blagojevich*, No. 05 C 4673, 2008 WL 68680, at *3 (N.D.Ill. Jan. 2, 2008) ("The party opposing discovery has the burden of showing the discovery is . . . unduly burdensome.").

8

violation of law, it is not admissible." (Dckt. #67 at 7 (citing *Mingo v. Roadway Express, Inc.*, 135 F.Supp.2d 884 (N.D.Ill. 2001)). Reed's argument is unpersuasive for three reasons. First, unlike in *Mingo*,[4] Anaya disputes Reed's claim that he learned of the April email chain improperly and he instead asserts that he was authorized to view the email chain at the time it was sent using a Reed company computer. (Dckt. #63 at 6). Second, even if Anaya had initially learned of the April email chain improperly, Reed produced the April email chain in discovery without designating its contents as being confidential under the confidentiality order entered in this case. Finally, even if the April email chain were inadmissible at trial, Reed cites no authority for the proposition that a document must be admissible to serve as the predicate for a parties' request for the production of other documents during discovery.[5]

    **2.    The April email chain provides a non-speculative basis to compel Reed to produce documents responsive to RFP 17.**

Again, Rule 26(b)(1) allows parties to obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. Reed is correct that "general fishing expeditions into areas *unrelated* to a plaintiff's claim are not permitted" under the Rule. *Gibbs v. Fam. Care Ctr. of Ind., LLC*, No. 2:09-CV-385-WCL-PRC, 2011 WL 839666, at *4 (N.D.Ind. Mar. 7, 2011) (emphasis in original). Nonetheless, "[i]t is true that some amount of fishing is generally necessary in the pretrial discovery process." *Eternal Mart, Inc. v. Nature's Sources, LLC,* No. 19-CV-02436, 2019 WL 6052366, at *3 (N.D.Ill. Nov. 15, 2019) (citing *Nw. Mem'l*

---

[4] In *Mingo*, the defendant asserted without contradiction that the plaintiff had tape-recorded his termination interview with defendant's employees without their consent in violation of the Illinois Eavesdropping Act. *Mingo*, 135 F.Supp.2d at 891-92.

[5] The holding in *Mingo*, where the district court granted defendant's motion in limine to bar the introduction of plaintiff's illicit tape recording on the ground that the Illinois Eavesdropping Act prohibits the admission at trial of any evidence obtained in violation of its provisions, provides no support for Reed's position here. *Mingo*, 135 F.Supp.2d at 891-92.

*Hosp. v. Ashcroft*, 362 F.3d 923, 931 (7th Cir. 2004) ("[P]retrial discovery is a fishing expedition and one can't know what one has caught until one fishes."); *Mosely v. City of Chicago*, 252 F.R.D. 421, 428 n.8 (N.D.Ill. 2008), *order vacated in part on other grounds*, 252 F.R.D. 445 (N.D.Ill. 2008) ("After *Northwestern Memorial Hospital*, it is no longer an answer in a discovery dispute to brand the endeavor a 'fishing expedition.' That is the purpose of discovery. . . .").

Some degree of latitude in discovery is particularly important in discrimination cases given the challenges in proving such claims. As the Seventh Circuit has observed:

> Proof of [intentional] discrimination is always difficult. Defendants of even minimal sophistication will neither admit discriminatory animus nor leave a paper trail demonstrating it; and because most employment decisions involve an element of discretion, alternative hypotheses (including that of simple mistake) will always be possible and often plausible. . . . A plaintiff's ability to prove discrimination indirectly, circumstantially, must not be crippled by evidentiary rulings that keep out probative evidence because of crabbed notions of relevance or excessive mistrust of juries.

*Riordan v. Kempiners*, 831 F.2d 690, 697-98 (7th Cir. 1987); *Butler v. Exxon Mobil Ref. & Supply Co.*, No. CV 07-386-C-M2, 2008 WL 11351509, at *4 (M.D.La. July 22, 2008) ("Proof of wrongdoing, particularly in an employment discrimination case, is difficult to establish, and plaintiffs should be afforded the opportunities to discovery all factual information pertinent to their case."); *Goff v. Wheaton Indus.*, 145 F.R.D. 351, 356 (D.N.J. 1992) ("This court is painfully aware of the difficulty a plaintiff faces in pursuing discrimination claims. Where appropriate, courts often afford litigants latitude in conducting discovery.").

To establish his right to fish with RFP 17, Anaya must present some non-speculative basis for concluding that there may be fish in the pond in which he seeks to cast his net (i.e., that the ESI search through the emails of Birck and Krueger that is called for by the request may yield responsive documents that are relevant to his claims). *See, e.g., Russell v. City of Chicago*, No. 20-CV-1163, 2022 WL 294765, at *2 (N.D.Ill. Feb. 1, 2022) (party seeking discovery must

10

offer more than mere speculation that the subject of discovery could house relevant evidence); *Sirazi v. Panda Express, Inc.*, No. 08 C 2345, 2009 WL 4232693, at *3 (N.D.Ill. Nov. 24, 2009) ("[W]ithout some reason to conclude that the pond might be stocked, one cannot demand to 'fish.'"); *Eternal Mart*, 2019 WL 6052366, at *3 (denying requested discovery after observing that "[t]he problem here is that Nature's Sources has not given the Court any reason to believe that the pond might be stocked with fish").

In this case, Anaya asserts that defendants retaliated against him for failing to side with them against an African American (Fairweather) who accused Reed of race discrimination and for voicing his own complaint of discrimination. He further alleges that Reed discriminated against him based on his race by paying him a below market salary. To prove his claims, Anaya must present evidence sufficient to permit a reasonable factfinder to conclude that his protected conduct (namely, his opposition to, or complaint regarding, discrimination) and/or his race caused defendants to take adverse action against him. *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *Igasaki v. Illinois Dept. of Fin. and Prof'l Regul.*, 988 F.3d 948, 957 (7th Cir. 2021). In short, the issue is whether a causal link exists between Anaya's protected activity and/or his race and the adverse employment actions at issue. Courts consider all relevant direct and indirect (or circumstantial) evidence in determining whether a plaintiff has made this required showing. *Ortiz*, 834 F.3d at 765; *Igasaki*, 988 F.3d at 957.

Courts from this Circuit and elsewhere have held that "[e]vidence of a racially-biased corporate culture can be circumstantial evidence of discrimination against a particular plaintiff." *Martin v. F.E. Moran, Inc.*, No. 13 C 3526, 2018 WL 1565597, at *27 (N.D.Ill. Mar. 30, 2018) (citing *Mattenson v. Baxter Healthcare Corp.,* 438 F.3d 763, 770 (7th Cir. 2006)); *Rachells v. Cingular Wireless Emp. Servs., LLC*, 732 F.3d 652, 665 (6th Cir. 2013) ("Circumstantial

11

evidence establishing the existence of a discriminatory atmosphere at the defendant's workplace in turn may serve as circumstantial evidence of individualized discrimination directed at the plaintiff.") (internal quotation marks omitted); *Cummings v. Standard Register Co.*, 265 F.3d 56, 63 (1st Cir. 2001) ("[E]vidence of a discriminatory 'atmosphere' may sometimes be relevant to showing the corporate state-of-mind at the time of termination. . . . While such evidence does not in itself prove a claim of discrimination[,] . . . [it] does tend to add color to the employer's decision-making processes and to the influences behind the actions taken with respect to the individual plaintiff.") (internal quotation marks and citations omitted); *Parker v. Sec'y, U.S. Dep't of Hous. & Urb. Dev.*, 891 F.2d 316, 322 (D.C.Cir. 1989) ("the existence of a discriminatory atmosphere . . . could serve as circumstantial evidence of individualized discrimination.").

Courts have also recognized that "[r]emarks by corporate executives are particularly probative of a discriminatory environment." *Martin*, 2018 WL 1565597, at *28 (citing cases); *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 356 (6th Cir. 1998) ("Discriminatory statements may reflect a cumulative managerial attitude among the defendant-employer's managers that has influenced the decisionmaking process . . . ."); *Ryder v. Westinghouse Electric Corp.*, 128 F.3d 128, 132 (3d Cir. 1997) ("[A] plaintiff may offer circumstantial proof of intentional discrimination . . . in the form of . . . formal or informal managerial attitudes held by corporate executives."). This is especially true where such remarks are made by executives in the upper echelon of the defendant corporation's leadership who were responsible for the decisions in question. *See, e.g., Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 632 (7th Cir. 1996) (noting the significance of biased remarks made by "the top policymakers in the company . . . who [we]re ultimately responsible for the company's employment practices" and

12

were involved in the promotions at issue); *Rachells*, 732 F.3d at 665-66 ("Fine's conduct is highly probative of the motivations underlying [plaintiff's] termination because he was the top Cleveland official in Cingular's managerial hierarchy and the final decisionmaker in the RIF selection process."); *Martin*, 2018 WL 1565597, at *28 (citing cases); *see also Joll v. Valpraiso Cmty. Schools*, 953 F.3d 923, 935 (7th Cir. 2020) ("A remark or action by a decision-maker reflecting unlawful animus may be evidence of his or her attitudes more generally.").

Finally, "[e]vidence of a . . . discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with . . . [the] timeframe involved in the specific events that generated a claim of discriminatory treatment." *Rachells*, 732 F.3d at 666 (internal quotation marks omitted); *Ryder*, 128 F3d at 133-34 (holding that biased comments by the company CEO and executives with authority to render personnel decisions were relevant and admissible notwithstanding the fact that the comments did not concern the termination in question and were made one year after the decision was made); *Ercegovich*, 154 F.3d at 356 ("[E]vidence of a corporate state-of-mind or a discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with the particular actors or timeframe involved in the specific events that generated a claim of discriminatory treatment.") (internal quotation marks omitted).

Accordingly, ESI searches need not be limited to communications that directly discuss a plaintiff or their claims to be permissible. In *Martin*, for example, the court permitted plaintiffs alleging race discrimination claims under Title VII and §1981 to search the company emails of defendant's high-level employees for five race-related terms: "Black, African American, diversity, minority, and discrim-." (*Martin v. F.E. Moran, Inc.*, No. 13 C 3526, Dckt. #96 at 19). Although defendant's attorney initially asserted that this search would "pull up things that have absolutely nothing to do with [plaintiffs' claims]," (*Id.* at 18), the search uncovered numerous

13

emails the court ultimately deemed "racially offensive," *Martin*, 2018 WL 1565597, at \*17. None of the emails mentioned the individual plaintiffs, but plaintiffs' expert testified that they evidenced stereotypes and spoke to "a broader corporate culture" of discriminatory behavior. *Id.* at \*21. This was true even when the company's executives received but did not respond to discriminatory emails. The *Martin* court described the testimony related to the emails as "fascinating" and "powerful":

> Recognizing that when a recipient of a discriminatory email does not respond to it by rejecting it or passes it on to another can be implicit validation of that behavior is real and valid. Creating [an] environment that accepts the denigration of a race, culture, or gender can most definitely send a message to those making hiring and firing decisions that this is how management wants these decisions to be made.

*Id.* at \*37.

Despite the "strong and damning" nature of the discriminatory emails in *Martin*, they failed to carry the day for plaintiffs because plaintiffs "failed to link those communications to the decision makers in th[e] case." *Id.* In this case, by contrast, Reed's highest-ranking executives Birck and Kreuger are the decision makers. Accordingly, emails reflecting comments made or received by them that reflect racial animus or disdain for minorities advocating for equal treatment – if any such emails exist – would provide evidence relevant to Anaya's discrimination and retaliation claims within the meaning of Rule 26(b)(1).

Anaya asserts that the April email chain provides a non-speculative basis to compel defendants to produce ESI responsive to RFP 17 because it shows that Birck (Reed's CEO) is "particularly sensitive about minorities complaining about discrimination." (Dckt. #63 at 2). In particular, after Birck received an email expressing the view that a school that had gone "woke" and embraced BLM (Black Lives Matter) was "increasing racism not helping it," Birck "agreed" that this was "disturbing" and expressed his view that "[u]ntil parents pull enough kids out to

14

hurt them financially this is likely to continue." (Dckt. #63 at 34). In Anaya's view, Birck's reaction to the school's embrace of BLM (an organization that seeks to highlight racism, discrimination, and inequality experienced by Black people)[6] displays a retaliatory mindset – especially given Birck's suggestion that parents could force the school to disavow BLM by hurting the school financially. While defendants disagree with this reading of the April email chain, the Court finds that Anaya's interpretation of the exchange is one reasonable way to interpret it.

Anaya (who also seeks to search Kreuger's email mailbox) further asserts that it is reasonable to infer that COO Kreuger "views the world" in the same manner as CEO Birck because Kreuger told Anaya to back Reed against Fairweather. (Dckt. #63 at 2, 6). This inference is not implausible given the recognition by courts that top level executives have the capacity "to shape the attitudes, polices, and decisions" of their colleagues. *See Ercegovich*, 154 F.3d at 355 ("[W]e note that Gallagher, as the head of the entire Retail Sales Division, was in a position to shape the attitudes, policies, and decisions of the division's managers . . . .") (citing cases); *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 546 (3d Cir. 1992) ("When a major company executive speaks, everybody listens in the corporate hierarchy.") (internal quotation marks omitted).

The Court recognizes that the inferences which Anaya seeks to draw from the April email chain are not the only ones that could be drawn. Nonetheless, the Court finds that the April email chain provides Anaya with a sufficient non-speculative basis to clear the "low bar" of showing that RFP 17 is reasonably calculated to lead to the discovery of ESI that is relevant to his claims, at least insofar as the ESI search is limited to the email mailboxes of Birck and

---

[6] Wikipedia, *Black Lives Matter*, https://en.wikipedia.org/wiki/Black_Lives_Matter (last visited May 12, 2022).

Kreuger for the specified time frame (January 1, 2019, through the present).[7] *See, e.g., DeLeon-Reyes v. Guevara*, No. 1:18-CV-01028, 2020 WL 3050230, at *7 (N.D.Ill. June 8, 2020) ("it is true that relevance in discovery is a low bar to meet"); *Sirazi v. Panda Express, Inc.*, No. 08 C 2345, 2009 WL 4232693, at *2 (N.D.Ill. Nov. 24, 2009) ("As expansive as the concept of relevance is under the Federal Rules of Evidence, it is even broader under Rule 26 of the Federal Rules of Civil Procedure.").[8] Accordingly, plaintiff's motion to compel is granted and defendants are ordered to produce the ESI responsive to RFP 17 to plaintiff's counsel on or before May 27, 2022.

### C. Anaya cannot depose Reed's corporate counsel, Sheryl Jaffee Halpern.

On February 4, 2022, Anaya served a Subpoena to Testify at a Deposition on Halpern. Reed filed the instant motion to quash the deposition subpoena on February 10, 2022. (Dckt. #71). Reed argues that almost any testimony that Anaya might seek from Halpern would be protected under the attorney-client privilege and the attorney work product doctrine.[9] Halpern

---

[7] As stated above and per Anaya's agreement, the word "wall" is deleted from the search required by RFP 17. In addition, the Court, in its discretion, will delete the words "liberal" and "Trump" from the search required of defendants because, as defendants assert, those terms – standing alone – are more related to political viewpoints. *See Gile v. United Airlines, Inc.*, 95 F.3d 492, 496 (7th Cir. 1996) ("[A] district court is not limited to either compelling or not compelling a discovery request; in making its ruling, a district court should independently determine the proper course of discovery based upon the arguments of the parties."). Finally, the request is limited to communications sent to and from Birck and Kreuger's company email accounts.

[8] The Court further notes that defendants – who indicated that they would run the ESI search requested by RFP 17 (Dckt. #63 at 25) and presumably have done so given their objection that the inclusion of the term "wall" in the request generated too much noise in the search data – do not represent that there are no additional documents responsive to RFP 17. Furthermore, the April email chain – the very sort of ESI that would be responsive to RFP 17 – was exchanged between Birck and a Reed Executive Vice President. Thus, unlike in *Sirazi* (upon which defendants rely), there "is some reason to conclude that the pond might be stocked" and Anaya will be allowed to fish. *Sirazi,* 2009 WL 4232693, at *3.

[9] Reed asserts that this information would also be protected under Federal Rule of Evidence 408. (Dckt. #71 at 5). There are two problems with this argument. First, evidence is only inadmissible under Rule 408 when offered "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed.R.Evid. 408. Anaya seeks information related to the

16

serves as Reed's general counsel and, in that role, she has advised Reed on the investigation of Fairweather's claims, Anaya's termination, and Anaya's civil rights allegations. In response, Anaya assures the Court that he would not question Halpern regarding privileged information and notes that even if he did, she would, of course, be entitled to refrain from answering. (Dckt. #72 at 4). As to what he *would* discuss with Halpern, Anaya cites only the threats of litigation Halpern made during settlement negotiations between Reed and Anaya.

While the party seeking to quash a subpoena bears the burden of demonstrating that the information is privileged or otherwise protected, *Wauchop v. Domino's Pizza, Inc.*, 138 F.R.D. 539, 543 (N.D.Ind. 1991), the party requesting discovery "bears the initial burden of demonstrating relevance," *St. Paul Guardian Ins. Co. v. Walsh Constr. Co.*, No. 15 CV 10324, 2021 WL 4777337, at *3 (N.D.Ill. Oct. 13, 2021). Anaya asserts that information related to the unsuccessful settlement negotiations is relevant to his retaliation claim because "it is actionable retaliation to threaten to initiate baseless litigation (or to initiate baseless litigation) unless a party withdraws his civil rights claims." (Dckt. #72 at 6).

On this point, he is correct. Not just any lawsuit will constitute an adverse action for purposes of a §1981 retaliation claim; instead, the threatened suit must be "independently an abuse of process." *Mlynczak v. Bodman*, 442 F.3d 1050, 1061 (7th Cir. 2006); *Mustafa v. NSI International, Inc.*, No. 15-CV-06997, 2016 WL 6778888, at *5 (N.D.Ill. Nov. 16, 2016) (citing cases); *see also Darveau v. Detecom, Inc.*, 515 F.3d 334, 343-44 (4th Cir. 2008) (holding that a plaintiff had alleged an adverse employment action when he alleged that "his employer filed a

---

settlement negotiations in order to show that Reed improperly threatened him, not to suggest that his civil rights claims are valid. Furthermore, "Rule 408 only applies to the admissibility of evidence at trial and does not necessarily protect such evidence from discovery." *White v. Kenneth Warren & Son, Ltd.*, 203 F.R.D. 364, 368 (N.D.Ill. 2001) (internal quotations omitted). Accordingly, Rule 408 has no bearing on the Court's analysis here.

lawsuit against him . . . without a reasonable basis in fact or law"). In order to succeed on his retaliation claim, then, Anaya must show that: (1) Reed threatened him with litigation; and (2) the threatened litigation did not have reasonable basis in fact or law. The problem with Anaya's quest to depose Halpern on these matters is that he already possesses evidence of prong one, and any information related to prong two would certainly be privileged.

First, Anaya need not depose Halpern to show that Reed used the prospect of litigation in an effort to dissuade him from pursuing civil rights claims. He is currently in possession of Halpern's email, Birck's letter (described in Section I, *supra*), and Reed's counterclaim itself, all of which indicate that Reed threatened – and ultimately pursued – litigation against Anaya in response to his suit. "Where the deposition of an attorney can be avoided because the same information is available from other, non-privileged sources, it is prudent for the parties to pursue that course of discovery first." *Espejo v. Santander Consumer USA, Inc.*, No. 11 CV 8987, 2014 WL 6704382, at *3 (N.D.Ill. Nov. 25, 2014). As to the second question – whether the claims underlying those threats are baseless – the Court cannot conceive of any testimony Halpern could provide on this matter that would not disclose privileged information.

Aside from the settlement negotiations, Anaya did not identify any additional topics about which he would like to question Halpern. Because any conceivably relevant information related to the settlement conferences is either already in Anaya's possession or privileged, Anaya has failed to demonstrate that he should be permitted to depose Halpern. *See St. Paul Guardian Ins. Co.*, 2021 WL 4777337, at *3 (granting protective order barring defendant from deposing plaintiff's in-house counsel where defendant failed to identify any specific, relevant, and non-privileged testimony plaintiff's attorney could provide). Accordingly, Reed's motion to quash is granted.

## CONCLUSION

For the foregoing reasons, defendant Reed's motion to quash plaintiff's subpoena of Halpern, (Dckt. #71), is granted. Plaintiff's motion to compel the unredacted email sent by Reed's outside general counsel to Reed's outside consulting counsel, (Dckt. #55), is denied. Plaintiff's motion to compel an amended response to Production Request No. 17, (Dckt. #63), is granted. By May 26, 2022, Reed is ordered to produce any emails that are responsive to RFP 17 to plaintiff's counsel as limited by the Court. By June 2, 2022, the parties shall submit a joint status report setting forth what discovery remains and a timeline for its completion.

**ENTERED:** May 13, 2022

**Jeffrey I. Cummings**
**United States Magistrate Judge**